**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JACK BEAM and RENEE BEAM, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 07 C 1227 |
| | ) |
| MATTHEW S. PETERSEN, FEDERAL | ) Judge Rebecca R. Pallmeyer |
| ELECTION COMMISSION CHAIRMAN, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Jack and Renee Beam claim that Defendant, the Federal Election Commission ("FEC") improperly obtained their private financial records from the Department of Justice ("DOJ") without following certain requirements outlined in the Right to Financial Privacy Act of 1978 ("RFPA"), 12 U.S.C. § 3401 *et seq*. Defendant denies Plaintiffs' claim, arguing that Plaintiffs have failed to prove that the DOJ transferred their financial records to the FEC. Defendant moved for summary judgment and the court denied the motion. The court then conducted a two-day bench trial and heard testimony from various DOJ and FEC officials, as well as Plaintiffs themselves. The court presents below its findings of fact and conclusions of law pursuant to FED. R. CIV. PRO. 52(a). Based on the evidence presented at the trial, the court now finds in favor of Defendant.

## FACTUAL BACKGROUND

This case had its origin in 2005 when the DOJ suspected that a Michigan law firm, Fieger, Fieger, Kenney & Johnson, was violating the Federal Election Campaign Act ("FECA"), 2 U.S.C. § 441f, by reimbursing its employees in return for their contributions to John Edwards' 2004 presidential campaign. *Beam v. Petersen*, No. 07 C 1227, 2010 WL 476018, at *1 (N.D. Ill. Feb. 4, 2010). Such violations of § 441f violations are referred to as "conduit contribution cases," in which a person or entity advances or reimburses another individual for a campaign contribution, so that "the [conduit] whose name is reported as making the contribution is not the true source of the

funds." (Trial Tr. vol. 1, at 159.)  In 2006, the FEC opened its own inquiry into the Fieger law firm to determine whether there was "reason to believe"[1] the firm or its associates had violated § 441f through a reimbursement scheme.  (Def.'s Proposed Findings of Fact and Conclusions of Law (hereinafter "Def.'s Mem.") ¶¶ 4.)  During this initial inquiry, the FEC searched the Fieger firm's website and discovered several names that also appeared in a FEC database of federal campaign contributions to the Edwards campaign.  (*Id.* ¶ 5.)  The name of Jack Beam, an attorney who is of counsel at the Fieger firm, appeared on the firm's website, and the database showed that he and his wife, Renee Beam, had each contributed $2,000 to the Edwards campaign in 2003.  (Letter from FEC to J. Beam of 9/26/06, Ex. A to Def.'s Reply Mem. in Supp. of its Mot. in Limine (hereinafter "J. Beam RTB Letter"); Letter from FEC to R. Beam of 9/26/06, Ex. A to Def.'s Reply Mem. in Supp. of its Mot. in Limine (hereinafter "R. Beam RTB Letter").)  At trial, Mr. Beam testified that sometime in 2006 he began to suspect that a federal agency had accessed his brokerage account at Merrill Lynch.[2]  Mr. Beam explained that he first contacted his personal banker who said, "I can't really talk to you," and later he received a letter from the bank stating that it was against "Merrill Lynch internal policy" to "inform clients whether [it had] provided information about them to the government." (Trial Tr. vol. 1, at 192-93; Trial Tr. vol. 2, at 355-56; Letter from Feldman to Beam of 6/9/06, Ex. 25 to Trial.)

The FEC eventually found "reason to believe" that the Fieger firm and certain employees,

---

[1] The FEC defines "reason to believe" as "a minimal standard which is generally assessed on the basis of publically available information."  (Def.'s Mem. ¶ 4.)  If after sufficient evidence is gathered and "at least four of the FEC's six commissioners find that there is 'reason to believe' FECA was violated, the FEC will open an investigation into the alleged wrongdoing." (*Id.*)

[2] At trial, Plaintiffs presented conflicting accounts of what led Mr. Beam to first suspect that their Merrill Lynch account was accessed.  Mr. Beam testified that he repeatedly asked the bank whether a federal agency had accessed his records, citing an exchange with the bank from May to June 2006.  (Trial Tr. vol. 2, at 355-56.)  Yet his attorney also suggested, and Mr. Beam did not dispute, that Plaintiffs initially became suspicious upon receiving letters from the FEC in September 2006.  (*Id.* at 192.)

2

including Plaintiffs, had violated § 441f, which prompted a formal civil investigation of the firm referred to as Matter Under Review ("MUR") 5818. (Def.'s Mem ¶¶ 9, 17). As a result, in September 2006, the FEC sent letters to Plaintiffs describing the factual basis it found to "investigate whether the [Edwards campaign] contribution attributed to [the Beams] actually was a contribution from the [Fieger firm] in the name of another," and stating that if Plaintiffs "accepted reimbursement for [their] contribution[s] to the Edwards committee, then [they] may have violated the Act." (J. Beam RTB letter at 3-4; R. Beam RTB letter at 3-4). In response, Plaintiffs vigorously denied ever receiving any reimbursement for their campaign contributions.[3] (Letter from J. Beam to FEC of 10/6/06, Ex. A to Def.'s Mem. in Supp. of its Mot. in Limine (hereinafter "J. Beam Resp. Letter"); Letter from R. Beam to FEC of 10/6/06, Ex. A to Def.'s Mem. in Supp. of its Mot. in Limine (hereinafter "R. Beam Resp. Letter").

Throughout the course of the two parallel federal investigations, staff members at the FEC and DOJ "interacted periodically . . . to share information and coordinate" their findings. (Def.'s Mem ¶ 13.) Given Plaintiffs' central claim here, much of the testimony at trial focused on the nature and extent of information shared between the DOJ and the FEC during the investigations of the Fieger firm and its employees. The court heard testimony from both Michael Kendall Day, an attorney at the DOJ, and Audra Wassom Bayes, an FEC staff attorney. Day and Bayes served as primary contact persons for each other at their respective agencies and met several times over the course of their investigations. (Trial Tr. vol. 2, at 255; Bayes Dep. 28:22-29:1-2.) Michael Day testified that after learning of the FEC civil investigation in late 2006 or early 2007, the DOJ sent several of its non-grand jury investigative reports ("FBI 302 reports") on the Fieger firm to the FEC. (Trial Tr. vol. 2, at 256.) But Day also testified that the DOJ never transferred Plaintiffs' financial

---

[3] Mr. Beam was particularly incensed by the FEC's claim that he had never contributed to a political committee prior to the Edwards campaign given his "long history of political activism and contribution to candidates for public office." (J. Beam Resp. Letter at 2.)

records to the FEC, and Bayes confirmed that she never received any of the Beams' financial records. (Trial Tr. vol. 2, at 264-65; Bayes Dep. 77:3-16.)

The DOJ continued its criminal investigation of the Fieger firm through the spring of 2007, but the FEC deferred conducting its civil investigation for MUR 5818 during this time. (Def.'s Mem. ¶¶ 18, 21; Trial Tr. vol 1., at 170.) Mark Shonkwiler, an attorney in the Office of General Counsel at the FEC, explained that while the FEC has the power to conduct administrative discovery, it declined to issue administrative subpoenas for any suspected conduit's bank records, including Plaintiffs', while the civil investigation was on hold. (Trial Tr. vol 1., at 163.) The DOJ, did however, serve Merrill Lynch with a grand jury subpoena in April 2007 to obtain Plaintiffs' bank records for its criminal investigation. (Trial Tr. vol. 2, at 252-53.)

In August 2007, the DOJ's investigation of the Fieger firm led to the indictment of two partners of the firm—Geoffrey Fieger and Vernon Johnson. DOJ found no evidence of Plaintiffs' participation in the alleged reimbursement scheme, however, and Plaintiffs were never charged with any criminal wrongdoing. (*Id.* at 263, 282-83.) *Beam*, 2010 WL 476018, at *1. Day testified that before the Fieger trial, he met with a potential expert witness named Thomas Andersen, the acting Assistant General Counsel of the FEC at the time. Day explained that it was standard practice to show a witness trial exhibits, but the DOJ did not use any of Plaintiffs' financial records as exhibits during the Fieger criminal trial. (Trial Tr. vol. 2, at 263-64). Moreover, Andersen testified that he did not see Plaintiffs' bank records, nor did he take any documents with him at the conclusion of his meeting with Day. (Trial Tr. vol. 1, at 132-33.) Andersen further testified that after their second meeting in late March or early April 2008, he received a packet of trial materials from Day, which contained a CD with contribution information "on hundreds, if not thousands, of contributors to the Edwards [campaign]." Anderson reported that he did not share this information with anyone at the FEC. (*Id.* at 133-34, 139.)

In June 2008, a jury acquitted both Fieger and Johnson. *Beam*, 2010 WL 476018, at *1.

After the Fieger criminal trial ended, Schenkwiler directed Bayes to contact the DOJ to obtain copies of the trial transcripts and exhibits so that the FEC could continue its civil investigation. (Trial Tr. vol. 1, at 179.) Day testified that he met with Bayes and provided her with a CD of the DOJ's trial exhibits, including "summary charts . . . to document the flow of money from Mr. Fieger through the conduits to the campaign." (Trial. Tr. vol. 2, at 259, 261). In her deposition, Bayes stated that she remembered receiving more than one CD from the DOJ, but that she was not entirely certain because she might have conflated the number of original disks she received from the DOJ with the number of duplicate copies she made for her office. (Bayes Dep. 34:13-15; 69:9-13.) In terms of the financial information in the exhibits used at trial, Day stated that "personal identifiers," such as "birth dates, social security numbers, address information, and bank account information" were redacted. (Trial Tr. vol. 2, at 262.) Day also confirmed that the DOJ did not use Plaintiffs' financial information at the Fieger trial and did not "transfer to the [FEC or Bayes] or to anyone else associated with the FEC their financial information." (*Id.* at 264.)

Later that same month, a staff attorney at the FEC named Phillip Olaya assumed primary responsibility for MUR 5818 after Bayes was promoted, and he received all of the files that she kept on the case. (Trial Tr. vol. 2, at 293-94.) In his deposition, Olaya testified that among the files he received was a CD containing "financial records [that] were part of the exhibits [used] at [the Fieger] trial." (Olaya Dep. 21:3-6.) Opposing counsel questioned Olaya further about the exact names associated with these financial records, and Olaya responded as follows:

> Q. And do you recall any of the names on these financial records?
> A. It's been awhile since I worked on the case. But if you said a name, it might ring a bell, so --
> Q. Do you recall seeing, for instance, Geoffrey Fieger's name?
> A Right.
> Q. Do you recall seeing, for instance, Paul Brochay's name?
> A. Yes.
> Q. And Jack Beam?
> A. Yes.
> Q. And Renee Beam?
> A. Yes.

(Olaya Dep. 27:22, 28:1-15.) In a sworn declaration submitted some months later, however, and again at trial, Olaya explained that he made a mistake in his deposition. In his declaration, Olaya stated that the trial exhibits he received from the DOJ actually "did not include any financial information that related to Jack or Renee Beam and were all part of the public record in *United States v. Fieger*." (Olaya Decl. ¶ 8; Ex. 9 to Def.'s Mem. in Supp. of its 2d Mot. for Summ. J.) He declared that "the acknowledgment that I saw any financial information that related to Jack or Renee Beam was a result of a lapse in concentration and occurred only because I had answered in the affirmative to the two previously identified individuals without fully considering Counsel's questions." (Olaya Decl. ¶¶ 11-12.) And at trial, he testified: "I guess I wasn't being very specific or I could have asked for a clarification about where I saw those financial records . . . ." (Trial Tr. vol. 2, at 304.)

Plaintiffs initially filed this suit against the Attorney General, the Chairman of the FEC and unknown FBI agents. They alleged violations of RFPA and FECA and retaliation for engaging in constitutionally-protected speech, and invoked the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. (Am. Compl.) After the court dismissed Plaintiffs' first amended complaint on all counts, *Beam v. Gonzales*, 548 F. Supp. 2d 596, 600 (N.D. Ill. 2008), Plaintiffs filed a second amended complaint, renewing their RFPA and retaliation claims, and adding a claim under the Fifth Amendment for selective and vindictive prosecution. (2d Am. Compl.) The court dismissed all of Plaintiffs' claims except for the instant RFPA claim against the FEC. *Beam v. Mukasey*, No. 07 C 1227, 2008 WL 4614324 (N.D. Ill. Oct. 15, 2008).

## **ANALYSIS**

This case is now limited to an allegation that the FEC violated § 3412(a) of the RFPA, which provides: "Financial records originally obtained pursuant to this chapter shall not be transferred to another agency or department unless the transferring agency or department certifies in writing that there is reason to believe that the records are relevant to a legitimate law enforcement inquiry . . . ."

12 U.S.C. § 3412(a). Plaintiffs argue that the FEC violated this provision of the RFPA when it obtained their bank records from the DOJ without a written certification. Defendant argues the certification requirement is irrelevant in this case, because Plaintiffs have failed to prove that the DOJ transferred their financial records. Thus, the bulk of the parties' post-trial briefs focus on the factual issue at hand: whether a transfer of Plaintiffs' financial records in fact occurred. Plaintiffs offer three main points to support their claim: (1) the FEC often examines bank records to prove a violation of FECA; (2) FEC staff attorneys likely obtained more than one CD of trial materials from the Fieger trial; and (3) Phillip Olaya admitted that he saw Plaintiffs' financial records. For the reasons explained below, the court concludes these circumstances are insufficient to meet Plaintiffs' burden of proof.

**A.   The FEC's Past Practice to Prove a FECA Violation**

At trial, several witnesses explained the ways in which the FEC may prove that an individual has violated § 441f of the FECA, and Plaintiffs' counsel specifically focused on the FEC's practice of examining bank records in order to prove a violation. For example, Plaintiffs' counsel read deposition testimony from Colleen Sealander, a former FEC attorney, who explained that the FEC "frequently used bank records" to prove FECA violations. (Sealander Dep. 12:8-12.) But the court also heard testimony from Mark Shonkwiler who stated that each case presents "unique circumstances," and "it's certainly less than half of the 441f cases that would involve us getting bank records from the conduit." (Trial Tr. vol. 1, at 165, 167.) Shonkwiler further testified that the FEC examines bank records "only . . . if everyone had denied the reimbursement and if the records that we obtained from the alleged source of money didn't show the payments being made." (Trial Tr. vol. 1, at 165-66.)

Plaintiffs suggest that the FEC's past practice of examining a conduit's bank records in § 441f cases, and the fact that Plaintiffs denied the FEC's reimbursement allegation, support the finding that the FEC would naturally have examined Plaintiffs' records in this case. The court is not

7

convinced. While the FEC's typical procedures for gathering evidence against a potential conduit is certainly relevant evidence, Plaintiffs have failed to offer anything other than showing that this practice exists. Moreover, Plaintiffs glossed over Shonkwiler's testimony that in the standard § 441f case, the FECA examines "the alleged source of money first, because it's much more efficient," and "once Mr. Fieger admitted at the criminal trial that he had reimbursed numerous people, there was really no further need to get bank records." (Trial Tr. vol. 1, at 162-63.) Thus, even if the FEC has examined bank records in similar cases, Plaintiffs have presented insufficient evidence that the FEC did in fact examine their finances in this case.

**B.    Fieger Trial Materials**

Both parties agree that trial exhibits from the Fieger criminal case were sent to the FEC sometime in the summer of 2008, but there is significant disagreement about the number of materials received by the FEC and the specific contents of the CD that the FEC received from DOJ. As noted above, the DOJ found no evidence of the Beams' participation in the alleged campaign reimbursement scheme, and Michael Day testified that the DOJ did not use Plaintiffs' financial records as exhibits in the Fieger trial. (Trial Tr. vol. 2, at 263.) Day testified that he transferred a CD containing trial exhibits to the FEC in June 2008, but said at trial that he knew "beyond a shadow of a doubt, that it contained only things [the DOJ] used at [the Fieger] trial." (*Id.* at 261-62.) Both Audra Wassom Bayes and FEC investigator Roger Hearron testified in their depositions that the FEC received more than one set of Fieger trial materials from the DOJ (Bayes Dep. 34:13-15; Hearron Dep. 24:3-9); at trial, however, Hearron recanted, stating that he received only one CD. (Trial Tr. vol. 1, at 56.) Plaintiffs also point to Phillip Olaya's deposition testimony in which he stated that the CD from the DOJ contained "more than ten, [but] less than twenty" .pdf files (Olaya Dep. 35:2), whereas the CD from the DOJ offered as Exhibit 1 at trial contains more than 100 .pdf files. Plaintiffs ask the court to therefore "draw the reasonable inference that there was another compact disc provided to the FEC from the DOJ which contained Plaintiffs' financial records." (Pl.'s Mem.

at 8.)

Regardless of how many CDs the FEC actually received, Plaintiffs have failed to show that any such disks contained their financial records in violation of the RFPA. Five separate witnesses—while arguably offering different accounts of the number of CDs they believed the FEC to have received—explicitly refuted distributing or obtaining Plaintiffs' financial records. The court was given no reason to doubt the veracity of their testimony, nor have Plaintiffs offered any evidence that rebuts it. (Bayes Dep. 77:3-16; Trial Tr. vol. 1, at 72, 140, 176; Trial Tr. vol. 2, at 264.)

**C.     Olaya Testimony**

Plaintiffs argue that Phillip Olaya's deposition testimony in which he admits seeing the Beams' financial records most strongly supports their RFPA claim. As the court has previously explained in its order denying summary judgment in this case: "two inferences are possible: either [Olaya] saw some records that were not trial exhibits or he did not see the Beams' financial records at all." *Beam*, 2010 WL 476018, at *3. Yet now the court has the benefit of having observed Olaya at trial. He testified that he was mistaken when he stated in his deposition that he had seen the Beams' financial information, and the court found that testimony credible. (Trial Tr. vol 2., at 304, 309.) One individual's faulty memory is not sufficient to persuade the court that a transfer of Plaintiffs' financial records actually occurred.

**CONCLUSION**

For the foregoing reasons, the court enters a judgment in favor of Defendant. Accordingly, Plaintiffs' request for statutory damages is denied. Plaintiffs' motions for reconsideration of pretrial rulings [187, 196] are stricken.

ENTER:

Dated: September 30, 2010

REBECCA R. PALLMEYER
United States District Judge